# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

─────────────

SHELLY AMARILLO, Individually,
ERICKSON AMARILLO, Husband,
et al.,

        Plaintiffs,

vs.                                                          Civ. No. 06-1173 WJ/ACT

THE UNITED STATES OF AMERICA,

        Defendant.


## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant's Motion to Dismiss or, in the

Alternative, for Summary Judgment, filed October 3, 2007 **(Doc. 21)**. This is a medical

negligence case against the United States Government under the Federal Tort Claims Act, 28

U.S.C. § 2671 et seq.  Having considered the parties' briefs and the applicable law, I find that

Defendant's motion is not well-taken and shall be denied.

### Background

In June 2003, Plaintiff Shelly Amarillo, an enrolled member of the Jicarilla Apache

Nation, underwent surgery at the Santa Fe Indian Hospital in Santa Fe, New Mexico.[1]  Plaintiffs

claims that the surgery resulted in negligently inflicted injury to Ms. Amarillo's liver.  Plaintiffs

allege that the injuries are permanent in nature and have necessitated multiple additional

hospitalizations and operative procedures, including, but not limited to, surgical resection of a

───────────────

[1] Plaintiff underwent a laparoscopic cholecystectomy which was converted to an open
cholecystectomy.

portion of Ms. Amarillo's liver and will likely result in the need for a liver transplant.  The

Complaint asserts a claim for medical negligence in Count I of the complaint; and a loss of

consortium brought by Mr. Amarillo in Count II of the complaint as a direct result of the injuries

sustained by his wife.  In addition, Plaintiffs Shelly and Erickson Amarillo bring claims as the

next best friends their minor children, Erickson Amarillo, Jr., Brittney Amarillo, Riannon Wilson

and Vivian Amarillo.

On the merits of this case, Defendant contends that its employees provided appropriate

evaluation, diagnosis and care for Shelly Amarillo.    In this motion, however, Defendant seeks

dismissal based on lack of subject matter jurisdiction becaus Plaintiffs failed to exhaust their

administrative remedies under the Federal Tort Claims Act.

**Discussion**

The Federal Tort Claims Act ("FTCA") constitutes a limited waiver of the federal

government's sovereign immunity from private suit.  28 U.S.C. § 1346(b).  The prerequisite for

liability under the FTCA is a "negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment, under circumstances

where the United States, if a private person, would be liable to the claimant in accordance with

the law of the place where the act or omission occurred." Id.

Under 28 U.S.C. § 2401(b), Plaintiffs had a two-year period within which to present their

claim in writing to Defendant, or it would be forever barred.[2]  Plaintiffs filed their federal

complaint on December 4, 2006 alleging a claim of medical negligence which Defendant asserts

---

[2]  The provision reads: "A tort claim against the United States shall be forever barred
unless it is presented in writing to the appropriate Federal agency within two years after such
claim accrues or unless action is begun within six months after the date of mailing, by certified
or registered mail, of notice of final denial of the claim by the agency to which it was presented."

occurred on June 6, 2003.  Plaintiffs contend that there are genuine issues of material fact concerning whether Plaintiffs knew or could have known of the alleged malpractice until some time in 2006, and thus summary judgment should be denied.

## I.      Legal Standard

The motion is brought as a motion to dismiss, or in the alternative, a motion for summary judgment.  However, because the motion to dismiss is based on a lack of jurisdiction, there is no need to convert the motion to dismiss to one for summary judgment based on defendant's reference to matters which are technically outside of the complaint.  SK Finance SA v. La Plata County, Bd. of County Commissioners, 126 F.3d 1272, 1275 (10th Cir. 1997); Sizova v. Nat'l Inst. of Standards & Technology, 282 F.3d 1320, 1324-25 (10th Cir. 2002). When a party challenges the allegations supporting subject-matter jurisdiction, the "court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." Holt v. U.S., 46 F.3d 1000, 1003 (10th Cir. 1995).  In such instances, a court's reference to evidence outside the pleadings does not convert a motion to dismiss to a Rule 56 motion for summary judgment.  Davis ex rel. Davis v. U.S., 343 F.3d 1282 (10th Cir. 2003).

The Court recognizes that when "resolution of the jurisdictional question is intertwined with the merits of the case," it is necessary to "convert a Rule 12(b)(1) motion . . .  into a [motion under] Rule 12(b)(6) ... or ... Rule 56."   This is not the case here. When deciding whether jurisdiction is intertwined with the merits of a particular dispute, "the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." Sizova, 282 F.3d at 1324.  The substantive issue in this case is whether Plaintiffs' alleged injuries were the result of medical negligence on the part of Defendants, not

whether Plaintiffs exhausted administrative remedies under the Federal Tort Claims Act.  See,
282 F.3d at 1325  (exhaustion of administrative remedies is "simply not an aspect of [a]
substantive claim of discrimination"); see also, Trobaugh v. U.S., 35 Fed.Appx. 812, at *2 (10th
Cir. 2002) (FTCA statute of limitations does not create a jurisdictional question intertwined with
the merits of the case, and thus court is not required to convert a motion to dismiss for lack of
subject matter jurisdiction on statute of limitations grounds into a motion for summary
judgment); cmp., Pringle v. U.S., 208 F.3d 1220, 1223 (10th Cir. 2000) (Feres doctrine which
determines whether the FTCA acts to except the government's actions from its waiver of
sovereign immunity, implicates merits issues, and should be decided on summary judgment
rather than as a 12(b)(1) motion to dismiss).   Thus, because the issue raised concerns exhaustion
rather than Plaintiffs' substantive claim under the FTCA, the Court will address the matter,
including the resolution of any disputed jurisdictional facts, under Fed.R.Civ.P. 12(b)(1).

## II.    Factual Background

### A.    Undisputed Facts

The material facts are not disputed.  On June 1, 2003, Plaintiff Shelly Amarillo presented
to the Santa Fe Indian Hospital ("SFIH") emergency room with acute inflammation of the
gallbladder.  On June 6, 2003, after obtaining Ms. Amarillo's consent, Dr. Philo Calhoun
performed gallbladder surgery.   Ms. Amarillo remained in the hospital from June 5, 2003 to
June 12, 2003. Deft's Ex. A & Attachments 1 to 4.[3]

During her postoperative recovery period, Ms. Amarillo developed a low grade

---

[3]  Unfortunately, both parties have designated their exhibits using letters.  To minimize
any confusion, the Court will specify the party offering the exhibit.

fever, an increase in alkaline phosphatase and bilirubin. Dr. Calhoun referred Ms. Amarillo to

Dr. Patrick Quinn, a private physician with Northern New Mexico Gastroenterology Associates,

P.A.. On June 11, 2003, Dr. Quinn performed an endoscopic retrograde

cholangiopancreatography ("ERCP") at St. Vincent Hospital in Santa Fe.  Deft's Ex. A &

Attachments 5 & 6.

On June 17, 2003, Dr. Calhoun saw Ms. Amarillo again at which time she was healing

well.  Exhibit A & Attachment 7.  On June 25, 2003, Ms. Amarillo was readmitted to SFIH with

a fever, nausea, vomiting, diarrhea, an elevated white blood count and elevated alkaline

phosphatase. She had an infection and clogged stent.[4] She was discharged on July 1, 2003. Deft's

Ex. A & Attachments 8 and 9.

During her stay at SFIH, Ms. Amarillo was again referred to St. Vincent Hospital on June

26, 2003 where Dr. Cornelius P. Dooley, a private physician with Northern New Mexico

Gastroenterology Associates, P.A., performed another ERCP on Ms. Amarillo. Ms. Amarillo

was noted to have a persistent leak from the cystic duct remnant, the old stent was removed and

another stent was put into place. Deft's Ex. A & Attachment 10. On July 8, 2003, Dr. Calhoun

saw Ms. Amarillo for a follow-up appointment and noted that she had a mildly tender abdomen

and hemorrhoids. He scheduled her for a follow up in his surgical clinic.  Deft's Ex. A &

Attachment 11.

On August 27, 2003, Dr. Calhoun saw Ms. Amarillo for a referral for another ERCP and

removal of the stent.  Deft's Ex.A & Attachment 13.  On September 3, 2003, Dr. Quinn

---

[4]  A stent is a short narrow metal or plastic tube, often in the form of a mesh, that is
inserted into the lumen of an anatomical vessel (as an artery or bile duct) especially to keep a
previously blocked passageway open.  Merriam-Webster's Medical Dictionary, 2008 ed.

performed another ERCP and endoscopic sphincterotomy and removed the previously placed stent.  Deft's Ex.A & Attachment 14.

Ms. Amarillo testified that, after her surgery on June 6, 2003, she was still throwing up, weak and feeling ill off and on. However, she expected the soreness to go away as she healed from the surgery, to feel better, to be able to eat, to go back to work and to be able to take care of her kids.  Deft's Ex. B (Shelly Amarillo Dep. at 43-45). Ms. Amarillo testified that she did not get better, she had a lot of diarrhea and fevers and she had to go back to the hospital for additional care.  Deft's Ex. B at 45-46.  Ms. Amarillo further testified that it was her expectation she would get better.  She did not expect to have fevers or diarrhea, she did not expect to continue to be in pain and she did not expect to have a second surgery. When she was not feeling better she was upset.  Deft's Ex. B at 46-49, 67.

At his deposition, Plaintiff Erickson Amarillo testified at his deposition that his wife had been through cesarean sections before but had not required another surgery or repeat testing. Deft's Ex. C (Erickson Amarillo Dep. at 22).  Mr. Amarillo also stated that when his wife went in for additional surgery on June 25, 2003, she had a big ball of fluid in her abdomen but neither he nor Ms. Amarillo asked about it.  Deft's Ex. C at 22-23. 17.  When Mr. and Mrs. Amarillo were told she had an infection, they did not ask how the infection was started.  Mr. Amarillo assumed it was caused by dirty instruments.  Deft's Ex. C at 24.

Although he was upset, Mr. Amarillo did not ask any doctor, including the private physicians who treated Ms. Amarillo, if something had gone wrong in the surgery and he kept the dirty instrument suspicion to himself.  Deft's Ex. C at 25.  He stated that he did not ask the providers what was going on with his wife because he put his faith in them that they would know.  Deft's Ex. C at 25.  Mr. Amarillo also testified that, from the time of the June 6, 2003

surgery, both he and Ms. Amarillo have had a lot of bad pain and suffering.  Between the surgery

and November 2003, Ms. Amarillo would feel better at times, but then would revert to being sick

again.  Deft's Ex. C at 28-29.

In December 2003, both Shelly Amarillo and Erickson Amarillo met with an attorney to

discuss Ms. Amarillo's gallbladder surgery and signed a fee agreement at that time.  Deft's Ex.

D (Ans. to Interrog. Nos. 2-5).

On August 18, 2005, Plaintiffs presented their administrative claims to the Department of

Health and Human Services.  Deft's Ex. E (Torres-Bruckheim Decl.)

B.      Plaintiff's Statement of Material Facts[5]

Defendant's factual recitation of  Ms. Amarillo's medical chronicles stop at December

2003, and merely mention the administrative claim filing in August 2005.  However, Plaintiffs

offer other facts they describe as material facts and which the Court find have some bearing on

the question of the accrual of Plaintiffs' FTCA claim.

For several months after the surgery, Plaintiffs thought that the difficulties Ms. Amarillo

had was simply part of the recovery process.  None of the doctors at the SFIS told Ms. Amarillo

that anything had gone wrong with the gallbladder operation.

However, when Ms. Amarillo failed to fully recover by November, 2003, Plaintiffs began

to suspect that the surgery on June 6, 2003 may have caused serious and permanent injuries to

her.  Pltffs' Exs E & F, Affidavits.  According to Defendant's own expert witness, Lawrence

Way, M.D., the problem turned out to be a misinterpretation of the cholangiograms which were

thought to reveal a normal common duct and intrahepatic ductal system, "although this turned

---

[5] Defendant does not refute these facts.

out to be incorrect." Pltffs' Ex. G (Dr. Way's report).  The actual problem was an occluded right

hepatic duct.  Dr. Way opined that Ms. Amarillo had a "rare anomaly that caused confusion

during the cholecystectomy."  Id.  Because of this anomaly, the cholangiogram showed the

bifurcation of the common hepatic duct to be much lower than it actually was, and showed the

cystic duct entering a large right posterior segmental duct instead of the usual common duct."

Id.  In his report, Dr. Way notes that "the same misinterpretation was subsequently made by all

of the surgeons, gastroenterologists, and radiologists who viewed x-rays of Shelly's bile ducts,

until the truth became apparent in early 2006."  Pltffs' Ex. G.  In short, according to Dr. Way,

the operation performed by Dr. Calhoun was futile.

> Other parts of Dr. Way's report are worth including here:

> What followed [the surgery in June 2003] was a lengthy illness, whose cause eluded
> many physicians. Everyone who saw [Shelly Amarillo] from 2003 to 2006 attributed her
> pain and fever to problems with the left side of the ductal system, while in fact, the
> problem was with the occluded right side . . . It was not until 2006, when CT scans
> showed a dilated right hepatic duct and atrophy of the right lobe of the liver, that the
> correct diagnosis was made.

Pltffs' Ex. G .[6]

> Ms. Amarillo remained under the continuing care of Dr. Calhoun until at least September

3, 2003.  Pltffs' Ex. H.

**III.     Analysis**

> As the party bringing suit against the United States, Plaintiffs bear the burden of proving

subject matter jurisdiction. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 182,189

---

[6] In April, 2006, a partial right hepatectomy was performed on Ms. Amarillo.  Dr. Way's
report states that she improved following this operation.  However, the fact that she still
experienced some symptoms as late as January 2007 raised questions "about whether all of the
obstructed portion of the right hepatic lobe has been resected.  The resection must be complete
before recovery can be expected."  Pltffs' Ex. G.

(1936) (party invoking federal jurisdiction bears the burden of establishing its existence); James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).

In determining whether an action has been filed within the two-year statute of limitations, the threshold inquiry is when the cause of action accrued. Federal law governs the point at which a claim accrues under the FTCA. Hoery v. United States, 324 F.3d 1220, 1222 (10th Cir.2003). Neither the FTCA nor its legislative history, however, speaks to when a "claim accrues."

In the Tenth Circuit, the general rule for accrual of an FTCA claim outside the medical malpractice context is the "injury-occurrence rule." Cannon v. U.S., 338 F.3d 1183, 1190 (10th Cir. 2003). An FTCA tort claim accrues on the date of the injury's occurrence. A different rule, the discovery rule, applies in medical malpractice cases, where a reasonably diligent plaintiff could not immediately know of the injury and its cause. Id.; United States v. Kubrick, 444 U.S. 111, 120, n.7 (1979) (emphasizing that while the general rule under the FTCA is that a tort claim accrues at the time of the plaintiff's injury, in medical malpractice cases the rule is that the 2-year period does not begin to run until the plaintiff has discovered both his injury and its cause.)

Accrual of an action is not dependent upon a claimant's knowledge that the acts causing injury might constitute medical malpractice. Id. at 123; Lopez v. U.S., 998 F.Supp. 1239, 1242 (D.N.M.,1998) (Accrual need not wait "awareness by the plaintiff that his injury was negligently inflicted") (citing Kubrick, 444 U.S. at 123). An action accrues under the FTCA when a plaintiff is in possession of the "critical facts" that he or she has been hurt, and who has inflicted the injury. Kubrick, 444 U.S. at 122.

In this case, Ms. Amarillo's continued symptoms and need for additional surgical intervention is the "injury," and the "cause" of the injury is the surgery of June 6, 2003. The real

question is: at what point in the sequence of continued symptoms did Plaintiffs possess the "critical facts" which triggered a duty to inquire into whether the surgery could have been the cause of her injuries?

Plaintiffs state in their affidavits that by November, 2003, when Ms. Amarillo failed to fully recover, they began to suspect that the surgery on June 6, 2003 may have caused her continuing symptoms.  Pltffs' Exs. E & F.  Defendant argues that this admission proves that the statute of limitations began to run on the date the injury occurred – that is, the date of the surgery.  In Defendant's line of analysis, the starting date for the limitations period would always revert back to June 6, 2003, regardless of when in the two-year period after the surgery Plaintiffs first got an inkling that the surgery itself might be the problem.  The flaw in this argument is that Defendant fuses the general rule for accrual of an FTCA claim – the "injury-occurrence rule – with the "discovery" rule.   For this reason, the Court rejects Defendant's contention that Plaintiffs' FTCA claim accrued on June 6, 2003.

Defendant also argues that Plaintiffs should have connected Ms. Amarillo's continued symptoms to the surgery within months of the surgery, and thus the two-year limitations period started running well before November 2003.  Defendant distinguishes two cases on which Plaintiffs rely by noting that unlike the present case, the plaintiffs in those cases were assured by medical professionals that there was no need for concern.  The Court does not find much of a distinction between those cases and the instant situation.

In Rosales v. United States, 824 F.2d 799 (9th Cir. 1987), Rebecca Rosales became pregnant with an intrauterine contraceptive device ("IUD") in place.  No one at the governmental facility where she received treatment advised her of the risks or dangers to the fetus of being pregnant with an IUD in place.  Ms. Rosales' baby was born three weeks prematurely, in March

1982, with a "lazy eyelid" and mild lethargy.  Both the physician who delivered the baby and the

pediatrician repeatedly assured the mother six weeks later that the child was fine and would

outgrow those difficulties.  It was not until September 1982 that Ms. Rosales was informed that

the child "might" be retarded.  In March 1983, a second CAT scan confirmed that the child had

permanent mental retardation.  Ms. Rosales first consulted an attorney in April 1984.  Her

administrative claims were filed in July 1984.  The court found that Ms. Rosales had no reason at

the child's birth to inquire about any cause of injury prior to July 1982, two years before filing

the administrative claims, based on the assurance given by physicians that the child would be

fine.  Thus, her FTCA claim was timely.

        In Chamness By and Through Chamness v. U.S., 835 F.2d 1350 (11th Cir. 1988), the

case turned on the date on which a connection could be made between brain damage during birth

at a military facility and the use of drugs during the delivery.  Even though Mrs. Chamness was

fully aware of the child's impairment, she had no reason to suspect a governmental cause for the

impairment.  More than three years after the birth, Mrs. Chamness learned from a television

news program of the possibility of brain damage resulting from use of drugs during delivery.  A

doctor confirmed this connection, at which time the court found started the running of the statute

of limitations.  Defendant attempts to distinguish this case from the present case by noting that

the doctors in that case told Mrs. Chamness that they could not determine a cause of the injuries,

and that the baby's impairment was a "statistical aberration."  835 F.2d at 1352.

        In the present case, Defendant argues, Plaintiffs cannot rely on assurances from

physicians for their delay in inquiring into whether the surgery was done correctly.  The Court

finds this to be a weak distinction.  Although Plaintiffs were not told that Ms. Amarillo was a

"statistical aberration" (as Mrs. Chamness was told), or that the problems she was having would

eventually resolve (as Mrs. Rosales was told about her baby), the record indicates that Plaintiffs were informed that additional ERCP's were being done because there "might be more stones." Deft's Ex. C at 24-25.

The key date for Plaintiffs' claim is August 18, 2003, two years prior to the filing of the administrative claims on August 18, 2005.  In order for Defendant to prevail on the jurisdictional question, Plaintiffs' claims must have accrued prior to August 18, 2005. Thus, the critical inquiry is a determination of whether Plaintiffs had reason to inquire further into Ms. Amarillo's failure to recover after her surgery prior to August 18, 2003.

Defendant contends that Plaintiffs had the duty to inquire into the cause of her continuing symptoms of illness and pain prior to November 2003, and notes that Plaintiffs never asked any of the doctors in June whether something had gone wrong with the surgery.  The Court disagrees with the imposition of this burden on Plaintiffs so soon after surgery.  During the first four months following surgery, Ms. Amarillo went through four ERCP's: June 11th, June 26th, August 27th and September 3rd.  Her symptoms continued into June and July.

Defendant makes much over Plaintiffs' suspicions that dirty surgical instruments may have played a part in Ms. Amarillo's continued illness after the surgery, but that Mr. Amarillo kept this to himself.  See, Deft's Ex. C at 24-25.  However, his reluctance to question the doctors about the surgery was not unreasonable at that point.   Plaintiffs had been warned of complications from surgery that could include bleeding and risk of infection.  Pltffs' Ex. B (Erickson Amarillo Dep. at 19-21).  Plaintiffs were led to believe the initial surgery had not extracted all the stones.  Also, because Plaintiffs trusted the doctors they did not question the doctors' care during Ms. Amarillo's ordeal in the first months after the surgery.  Deft's Ex. C at 23.

12

In the first few months following Ms. Amarillo's surgery, Plaintiffs were aware of an injury, but not the cause, as required under <u>Kubrick</u> and Tenth Circuit case law. <u>See</u>, <u>Arvayo v. U.S.</u>, 766 F.2d 1416, 1420 (10th Cir. 1985) (noting that <u>Kubrick</u>'s use of the word "cause" means more than mere awareness of the medical cause in cases involving a failure to diagnose, treat, or warn). Without the critical facts relating to a cause, the limitations period was not triggered.  Sheer speculation, such as dirty instruments playing a role in postoperative infection, does not constitute knowledge of a cause for Ms. Amarillo's continued illness.

In <u>Jastremski v. U.S.</u>, 737 F.2d 666 (7th Cir. 1984), the plaintiff, Dr. Jastremski, was a pediatrician at the Army Hospital where his son was born in 1971.  The baby was born in a breech position.  Drugs were administered to induce labor, and a spinal anesthetic was given against both parents' wishes.  Soon after the anesthetic was administered, the mother's contractions all but disappeared.  The attending physician directed Dr. Jastremski and a nurse to push on the mother's abdomen against the child's head as hard as they could, and the baby was finally pulled from its mother.

Fifty-one hours after his birth, the baby suffered a series of grand mal seizures.  Test performed at the hospital were negative.  The baby was later seen by a pediatric neurologist, but no neurological cause was found.  The baby had no more seizures after those in the hospital shortly after birth.  However, at age two, the baby developed an abnormal gait, which was diagnosed as orthopedic.  It was not until 1975 that a neurologist, at plaintiff's home on a social visit and observing the child, suggested that the child might have cerebral palsy.  The Jastremskis did not make a possible causal connection between the child's physical condition and the events surrounding his birth did not occur to them until after that visit in 1975.  In October of that year, the Jastremskis filed administrative claims on behalf of their son.

13

The government in that case argued that the Jastremskis surely should have become aware of the child's brain injury by July of 1973 when the injury manifested itself in difficulty walking.  The action would then be barred because the claim was filed more than two years after discovery of the injury occurred.  However, the district court refused to impute knowledge of the cause of the child's injury prior to 1975 – even though the child's father was a physician, was present in the deliver room to observe his son's traumatic birth, and knew that his son had seizures soon after birth and later developed walking problems.  The court noted that:

> A doctor might possibly regard these difficulties as manifestations of an underlying injury. The same physician also could surmise, at least in theory, that such an injury was neurological in nature.  Assuming these propositions to be true, we refuse to impute to Dr. Jastremski, contrary to his testimony, knowledge he did not have in 1973 or before; namely, that his son suffered from a brain injury and that such injury probably was caused by acts of the defendant when [the child] was born.

737 F.2d at 670.  The Seventh Circuit affirmed the district court's finding that the Jastremskis' FTCA claim was not barred by the statute of limitations.

The Jastremski case is worth noting in detail because the court in that case would not impute knowledge of an injury that might plausibly be expected in a physician.  Here, on the other hand, Defendant asks this Court to impute awareness on Plaintiffs (who are laypersons) of knowledge that, based on unrefuted evidence, Ms. Amarillo's own physicians did not have until 2006.  See, Pltffs' Ex. G (Dr. Way Aff.) (What followed was a lengthy illness, whose cause eluded many physicians. . . .").  Moreover, the time-bar issue spans a three-month period, as opposed to the several years that passed in Jastremski.  Plaintiffs' administrative claim was filed on August 18, 2005.  In order for the claim to be untimely, the Court would have to find that Plaintiffs had the critical facts regarding *both* Ms. Amarillo's injury *and* its cause within two months of the surgery.  I find that, during that time, Plaintiffs had no reason to seek advice from

the medical or legal community regarding whether the surgery had been ill-advised.

I agree with Plaintiffs that Kubrick and Arvayo, two cases relied on by Defendant, are not factually analogous.  In April 1968, Mr. Kubrick was given an antiobiotic for treatment of an infected femur a Veterans Administration ("VA") Hospital.  He developed ear problems weeks afterward.  In January 1969, a VA physician told Mr. Kubrick that it was highly possible that the ear problems were the result of the antibiotic treatment.   In June 1971, in the course of pursuing an administrative appeal for VA benefits, Mr. Kubrick was told by another physician that the antibiotic had caused his ear injury and should not have been administered.  In reversing the Third Circuit Court of Appeals, the United States Supreme Court held that the statute of limitations began to run in 1969, when Mr. Kubrick first should have suspected a connection between the medication and his injury – and not later in 1971, when Kubrick first became aware that a possible legal duty had been breached.  Unlike Mr. and Mrs. Amarillo, Kubrick knew not only that he was injured, but that the drug administered by the VA was the cause of his injury.  Comparing the Kubrick case to the present case, the cause of Mrs. Amarillo's injury was not as clear to Plaintiffs (according to the available evidence) until 2006.

Arvayo v. U.S., 766 F.2d 1416 (10th Cir. 1985) is also instructive in its differences.  In Arvayo, a government doctor initially diagnosed a baby's ailment as a mere upper respiratory infection.  The next day a different doctor at the facility correctly diagnosed it as meningitis.  The child suffered severe brain injury as a result of the delay in treatment.  Plaintiffs argued that the statute of limitations did not begin to run until they learned later that even a brief delay in the proper treatment of meningitis could cause the damage.  The district court of Kansas agreed with their position, but the Tenth Circuit reversed, finding that the parents were under a duty to inquire when the second diagnosis was made.  The Tenth Circuit found that the parents had not

exercised reasonable diligence in inquiring as to the cause of their son's injury, even though "they were told by one doctor that their son had a mere URI and to bring him back in a week if he did not improve, and the next day informed that their son was in critical condition, possibly suffering from meningitis, with the likelihood of brain damage." 766 F.2d at 1422.  The Arvayo plaintiffs had been told, albeit within 24 hours, that their son suffered from a different diagnoses. In the present case, Plaintiffs were not been informed of any facts which would have led them to suspect that the surgery should not have been performed.

Like the plaintiffs in Rosales and Chamness, Plaintiffs here cannot be held to a duty to inquire when they did not yet have the critical facts concerning not only that an injury had occurred, but also the cause of the injury. To do so would lead to what the Seventh Circuit called "ghoulish" consequences: "whenever anyone suffered pain, injury or death in a government hospital, he or his survivors would request his record to see whether diagnosis or treatment might have played a role in his distress." Drazon v. U.S., 762 F.2d 56 (7th Cir. 1985), cited in Sexton v. U.S., 832 F.2d 629 (D.C.Cir. 1987) (internal quotes omitted).

Plaintiffs' FTCA action accrued when Plaintiffs had sufficient information to make a connection between her illness following surgery and Defendant's conduct.  I find that they lacked these critical facts prior September 2003, and even prior to November 2003.  See, Arvayo, 766 F.2d at 1420 ("It is not enough to trigger the statute of limitations that the claimant is aware of his injury if he is unaware of the act or omission which caused the injury") (citation omitted).  The fact that their awareness of such a connection did not occur until November 2003 is bolstered by another undisputed fact: that Plaintiffs promptly met with an attorney the following month to discuss Mr. Amarillo's gallbladder surgery, and signed a fee agreement at that time.

16

**IV.     Continuous Treatment Doctrine**

Under <u>Kubrick</u>, a medical malpractice case accrues under the FTCA when the claimant first knows of the injury and its cause.  In <u>Stephenson ex rel. Stephenson v. U.S</u>., 47 F.Supp.2d 1106 (D.N.M.,2001), the District of New Mexico adopted the exception to the strict discovery rule of <u>Kubrick</u>, joining several other circuits to do so.  47 F.Supp.2d at 1109-10.  Under the continuous treatment rule, the limitations period for filing a claim is tolled, under certain circumstances, for the period during which the injured party is receiving continuous treatment for the injury caused by the defendant's alleged negligence.  Because I have found Plaintiffs' FTCA claim to be timely under 28 U.S.C. § 2401(b), whether this doctrine applies to this case needs no resolution, and the Court makes no findings on this issue.

**Conclusion**

Based on the available record in this case, I find that Plaintiffs did not know of the critical facts of Ms. Amarillo's injury and its cause prior to November 2003.  Even if Plaintiffs were aware of these facts in September, because the administrative claim was filed on August 18, 2005, Plaintiffs' FTCA claim is not time-barred.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment (**Doc. 21**) is hereby DENIED, for reasons set forth in this Memorandum Opinion and Order.

_____

UNITED STATES DISTRICT JUDGE